UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CHELSEY DUDLEY,<br><br>        Plaintiff,<br><br>v.<br><br>BOISE STATE UNIVERSITY; TONY ROARK in his official and individual capacity; MANDY NELSON, in her official and individual capacity; KATE LAW, in her official and individual capacity; JOELLE POWERS, in her official and individual capacity; JOHN BUCKWALTER, in his official and individual capacity; CHRISTOPHER HYER, in his official and individual capacity; ROGER MUNGER, in his official and individual capacity; GUNNAR WHISLER, in his official and individual capacity; KELSIE ZAK, in her official and individual capacity; MIKE DIXON, in his official and individual capacity; and DOES I-X,<br><br>        Defendants. | Case No. 1:22-cv-00495-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is Defendants Boise State University (BSU), Tony Roark, Mandy Nelson, Kate Law, Joelle Powers, John Buckwalter, Christopher Hyer, Roger Munger, Gunnar Whisler, Kelsie Zak, Emma Ford, and Mike Dixon's (collectively "Defendants" or "BSU") Motion to Dismiss. Dkt. 19. Plaintiff Chelsey Dudley opposes the motion. Dkt. 22.

On March 13, 2024, the Court held oral argument and took the matter under advisement. Dkt. 32. Upon review, and for the reasons set forth below, the Court GRANTS Defendants' Motion and dismisses this case.

## II. BACKGROUND

On May 7, 2022, Dudley graduated from BSU with a Bachelor of Arts degree in Social Work. As part of her degree requirements, Dudley had to complete an internship. The BSU course code for her specific internship was SOCWRK 481. Dudley participated in an internship with the Idaho Department of Health and Welfare ("IDHW") in the spring of 2022, and, upon completion, received a passing grade in SOCWRK 481. In turn, Dudley qualified for, and received, her bachelor's degree.

On July 14, 2022, Dudley took and passed her Social Work Licensing Exam through the Idaho Department of Occupational Licensing. On August 24, 2022, Dudley became a licensed social worker in the State of Idaho.

On November 2, 2022, Defendant Tony Roark[1] sent Dudley a letter informing her that the IDHW had brought to his attention certain events that occurred during Dudley's internship earlier that year. Based upon information gleaned from a third party, the IDHW had opened an investigation into Dudley, the results of which established "beyond doubt that [Dudley] accessed confidential client information within IDHW's database . . ." during her internship and that she had "no authorization" or "legitimate business interest" in

---

[1] BSU Interim Divisional Dean for the College of Health Sciences School of Social Work.

looking into those files. Dkt. 15, at 19.[2]

Roark then informed Dudley that because of her conduct during her internship her passing grade for SOCWRK 481 would be changed to a failing grade. *Id*. He then explained to Dudley that, as a result of the grade change, she no longer met the requirements for graduation and would be contacted by the Office of the Registrar for further action. *Id*. Roark also told Dudley that, pursuant to University Policy 3130 ("Grade Appeal"), she could appeal his decision to change her grade. *Id*. Finally, Roark noted that the entire matter had been referred to the Dean of Students for possible disciplinary action under University Policy 2020 ("Student Code of Conduct"). *Id*.

As Roark alluded, the following day, Defendant Mandy Nelson from BSU's Office of the Registrar sent Dudley a letter stating that, in light of the grade change to SOCWRK 481, she "no longer satisf[ied] the graduation requirements for a Bachelor of Arts in Social Work" and her degree would be "rescinded." *Id*.

BSU subsequently sent the State of Idaho's Division of Occupational and Professional Licenses Board of Social Work Examiners a revised transcript showing that Dudley's bachelor's degree in social work had been removed from her official transcript.

On November 17, 2022, Defendant Kate Law, Assistant Dean of Students at BSU, sent Dudley an email entitled "Notification of Incident and Pre-Hearing Meeting." Dkt. 15, at 21. This email stated, among other things, that BSU had received information that Dudley had allegedly violated the Student Code of Conduct, the National Academy of

---

[2] The confidential information Dudley accessed was related to her ex-husband and his new partner.

Social Work code of ethics, the BSU student Professional Conduct and Professional Standards, IDHW's expectations for employees and interns, and state and federal privacy laws. Dkt. 2-2, at 12–13. Law said BSU was referring the allegations to the Conduct Hearing Board for review. She also set a pre-hearing date and time when she and Dudley could meet to discuss what would take place at the hearing. Law provided additional information regarding the hearing process itself and Dudley's rights in her email. The pre-hearing meeting was set for November 29, 2022, and the hearing for December 12, 2022.

Dudley attended the pre-hearing meeting. During that meeting, Law explained the procedures that would be followed at the Student Conduct Hearing in December and informed Dudley that the Complainant (the Office of the Dean of Students) did not intend to call any witnesses at the hearing but would instead present summaries from the IDHW investigation. She also informed Dudley of her rights at the hearing.

On December 7, 2022, Law provided Dudley with an information packet that included information about the Student Conduct Hearing and the evidence the Complainant intended to rely upon at the hearing. Dkt. 9-3.

Also on December 7, 2022, Dudley filed the instant lawsuit and a Motion for Temporary Restraining Order ("TRO"). Dkts. 1, 2.

In her Motion for TRO, Dudley asked the Court for two things: first, to enjoin BSU from conducting the Student Conduct Hearing scheduled for December 12, 2022; and second, to require that Defendants follow certain procedural safeguards during any

MEMORANDUM DECISION AND ORDER – 4

rescheduled hearing.[3]

On December 9, 2022, the Court issued a decision granting, in part, Dudley's Motion for TRO. Dkt. 4.[4] The Court noted it does not normally grant temporary restraining orders without hearing from the adverse party, but, considering the exigent circumstances and short timetable, it would temporarily do so in this case. Dkt. 4, at 9 n.5. In sum, the Court enjoined Defendants from holding the Student Conduct Hearing on December 12, 2022, required Dudley to serve Defendants, required Defendants to respond to Dudley's Motion for TRO on or before December 19, 2022, and set a hearing (via Zoom) for December 20, 2022. *Id*. at 10–11.

Based upon the Court's ruling, BSU vacated the December 12, 2022, Student Conduct Hearing.

The Court then held a hearing of its own on December 20, 2022, on whether to extend the TRO. Dkt. 10. Ultimately, the Court decided it *would not* extend the TRO but would allow it to expire on December 23, 2022. Dkt. 11, at 16, 18.

On January 9, 2023, Law sent a new notice to Dudley informing her that the Student Conduct Hearing had been reset for February 17, 2023. Dkt. 15, at 22. Law reiterated that BSU had received information that Dudley had violated Student Code of Conduct "Section

---

[3] Dudley also asked the Court to immediately reinstate her degree pending the outcome of these proceedings. The Court did not do so. Dkt. 11, at 13.

[4] The Court's ruling was limited to the issue of the TRO. It said it would "consider Dudley's request for a preliminary injunction only after the Motion has been fully briefed and a hearing has been held." Dkt. 4, at 2.

4/AC. Violation of University Policy and/or Law"[5] and alleged that Dudley had accessed confidential client information from IDHW's database in violation of the School of Social Work's field requirements, the NASW Code of Ethics, the Student Professional Conduct and Professional Standards, IDHW's expectations for employees and interns, and state and federal privacy laws. *Id*. On February 10, 2023, Law provided Dudley an informational packet for the rescheduled hearing. Again, the packet contained material about the hearing process, the information the Complainant intended to rely on, and a written response to the allegations Dudley had prepared following the previous round of communications.

On February 17, 2023, BSU held the Student Conduct Hearing. The Complainant presented its case in the same form as outlined in its notification to Dudley: with no live witnesses, only statements. One such witness statement came from Mike Dixon, IDHW Child Welfare Chief at Department of Health and Welfare, Region 3. Dixon's statement explained that he had informed Roark that Dudley "used [IDHW's] database which holds confidential, client information, to look up people she knows in her personal life" and that she "presumably read information from past child protection cases on these individuals" which, had it been discovered at the time of the events "would have been reason for immediately ending [Dudley's] internship." Dkt. 15, at 24.

Dudley presented her defense at the hearing. She did not dispute that she had viewed files of persons unrelated to her internship work at the IDHW, but stated she likely had

---

[5] "Violating any University policy, rule, regulation, requirement, directive or contract, whether published electronically or in hard copy, and/or violating any local, state or federal law." Dkt. 2-2, at 39.

"clicked on hyperlinks of caregivers in her own [] file." *Id*. at 34.[6] Dudley also took

questions from members of the Student Conduct Board. At the end of the hearing, the

Complainant requested the Student Conduct Board revoke Dudley's degree and expel her

from BSU.[7]

On March 1, 2023, Law informed Dudley that the Student Conduct Board had

determined that it was "more likely than not that [her] actions were in direct violation of

the ethical and professional standards and expectations that were set forth" as part of her

internship and imposed the sanctions of degree revocation and expulsion. Dkt. 15, at 37.

Dudley appealed the decision and was notified by Law on April 28, 2023, that the

appeal had been denied.

Dudley filed the operative Amended Complaint on July 14, 2023, alleging four

causes of action. Dkt. 15. Dudley's first three claims assert violations of procedural due

process under the Fourteenth Amendment to the United States Constitution and Article I,

Section 13 of the Idaho Constitution.[8] *Id*., at 39–49. Dudley's fourth claim is for injunctive

relief. *Id*. at 49–50.

---

[6] Notably, there is no indication that Dudley's *own* file was pertinent to her internship. Thus, even taking her defense at face-value, she still viewed files unrelated to her internship.

[7] Even though Dudley had already completed her coursework at BSU, it retained the right to take these steps. *See* University Policy 2020(D)(1) ("In the event of serious misconduct committed while still enrolled but reported after the student has graduated, the University may invoke these procedures, and if the former student is found responsible, the University may revoke that student's degree.").

[8] In their motion to dismiss, Defendants highlight there is no direct cause of action for violations of the Idaho Constitution. Dkt. 19-1, at 18. In response, Dudley recognized the same and withdrew those claims. Dkt. 22, at 2. This was accurate. As the Court noted recently, "this question has been clearly decided in this District. There is no direct cause of action for violations of the Idaho Constitution." *IRWS, LLC v. Elmore Cnty.*, 2023 WL 8832321, at *8 (D. Idaho Dec. 21, 2023) (cleaned up).

On September 25, 2023, Defendants moved to dismiss Dudley's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a plausible cause of action. Dkt. 19.[9] After an extended briefing period (*see* Dkts. 20, 23), the Court set the matter for oral argument. Dkt. 29.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a claim if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." "A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (cleaned up). Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "This is not an onerous burden." *Johnson*, 534 F.3d at 1122.

A complaint "does not need detailed factual allegations," but it must set forth "more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. The complaint must also contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id.* at 570.

In deciding whether to grant a motion to dismiss, the court must accept as true all

---

[9] Dudley also filed a Motion for Leave to File Sur-Reply. Dkt. 26. Therein, she alleged Defendants brought up a new argument in their reply brief. *See generally id.* The Court disagreed, denied the motion, and noted Plaintiff (and Defendants) would have opportunity to present any and all arguments they desired at oral argument. Dkt. 31.

well-pleaded factual allegations made in the pleading under attack. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A court is not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

In cases decided after *Iqbal* and *Twombly*, the Ninth Circuit has continued to adhere to the rule that a dismissal of a complaint without leave to amend is inappropriate unless it is beyond doubt that the complaint could not be saved by an amendment. *See, e.g., Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009).

## IV. DISCUSSION

The Fourteenth Amendment to the United States Constitution forbids the State of Idaho from depriving "any person of life, liberty, or property without due process of law." *Goss v. Lopez*, 419 U.S. 565, 572–73 (1975). To state a procedural due process claim, a plaintiff must allege: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).

Here, Dudley alleges she had a property interest in: (1) her SOCWRK 481 grade; (2) her Social Work degree; and (3) her diploma from BSU. She also contends that Defendants (in varying groups) did not afford her adequate due process in their efforts to revoke these interests. In like manner, Dudley claims she has a liberty interest in her degree and that she has suffered a reputational harm because of Defendants' actions.

In its prior decision, the Court discussed at length whether property interests were at stake in this case. Dkt. 11, at 8–12. Ultimately, the Court found that while it *appeared*

there was no defined property interest in Idaho as it relates to higher education (for a grade, degree, or diploma), the answer was not crystal clear. Thus, the Court gave Dudley the benefit of the doubt, and "assume[d], without formally deciding, that Dudley's interests here are entitled to due process protection." *Id*. at 11–12. That said, the Court concluded it did not want to "jump into the fray while the process [was] ongoing" and held that Dudley needed to engage with Defendants in the hearing and appeal process before the case moved forward in federal court. *Id*. at 15, 17.

Because the determination of whether a property interest is at stake in this case is a threshold question—and because the Court's conclusion on this topic forms the foundation of its dismissal today—it will dive deeper into this topic than it did previously. It will then analyze Dudley's companion claim that she has a liberty interest under the Fourteenth Amendment. Then it will discuss due process, qualified immunity, and Dudley's remaining claim for injunctive relief.

### A. Property Interest

The Constitution does not define property interests protected by the Fourteenth Amendment; rather, they are defined by independent sources, such as state statutes or rules entitling citizens to certain benefits. *See Goss*, 419 U.S. at 572–73 (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (holding that, though the Constitution does not define property rights, it does set forth specific procedures that must be followed before a property right can be taken)). Reference to "an independent source such as state law" will determine whether a "legitimate claim of entitlement" to the benefit exists. *Roth,* 408 U.S. at 577.

The Ninth Circuit has not recognized a generalized property interest in higher

education. Instead, it makes a state-specific inquiry to determine whether a property interest exists once a plaintiff meets her burden of identifying a source of law independent of the Constitution that purports to grant a cognizable interest. *See Doe v. White*, 859 F. App'x 76, 77 (9th Cir. 2021) (since "the Due Process Clause does not create freestanding property interests, a plaintiff must identify a cognizable property interest based on an independent source such as state law. We, therefore, examine California law to decide whether Doe had a clearly established property interest in her continued attendance at a state university.") (cleaned up); *Wynar v. Douglas County. Sch. Dist.*, 728 F.3d 1062, 1072 (9th Cir. 2013) (holding that, "*under Nevada law*, [the Plaintiff] had a property interest in his public education and was therefore entitled to due process before he could be suspended") (emphasis added).

Dudley does not dispute the above caselaw (Dkt. 22, at 5), but asserts that under Idaho caselaw, it is clear she has a legitimate property interest in her degree.[10]

The first issue, then, is what source Dudley relies on in asserting a protected property interest under Idaho law. *Roth,* 408 U.S. at 569–72. This is where Dudley's case begins and ends.

---

[10] To be concise, the Court will refer to Dudley's property interest as being "in her degree." However, Dudley's argument is broader in that it encompasses an interest in her grade, her degree, and her diploma. The Court necessarily includes all of these interests in the "degree" title.

Dudley previously cited to Idaho Code Sections 33-4005[11] and 33-3006[12] arguing these sections vest her with a property interest in her degree. The Court disagreed, holding that:

> These code sections relate to the management of state universities and the duties of their boards of trustees. They make no mention of property rights or due process. Interpreting them to vest students with a protected property interest in education, as Dudley asks the Court to do, would impermissibly stretch their plain meaning.

Dkt. 11, at 9.

---

[11] **Powers and duties of the board of trustees**. The board of trustees of said college upon proper conveyance thereof, shall have all rights and title to real estate and personal property of said college, control over all buildings, power to elect presidents and contract with faculty of said college, supervise students and all powers and duties with reference to said college as are now granted by the statutes of the state of Idaho to the board of regents of the University of Idaho, and the board of trustees of Idaho State University as set forth in Chapters 28, 29, 30, 36, 37 and 38 of Title 33, Idaho Code, as the same may hereafter be amended, are fully empowered to exercise said powers and assume such duties with relation to said college from and after January 1, 1969, unless otherwise specifically authorized herein to the exercise of said powers prior to said date.

Idaho Code § 33-4005.

[12] **General powers of board of trustees**. The board of trustees of the Idaho State University shall have the following powers:
1. To adopt rules and regulations for its own government and for that of the university.
2. To employ a president of the university and, with his advice, to appoint such assistants, deans, instructors, specialists and other employees as are required for the operation of the university; to fix salaries and prescribe duties; and to remove the president or other employees in accordance with the policies and rules of the state board of education.
3. With the advice of the president, to prescribe the courses and programs of study, the requirements for admission, the time and standard for graduation, and to grant academic degrees to those students entitled thereto.
4. To accept grants or gifts of money, materials or property of any kind from any governmental agency, or from any person, firm or association, on such terms as may be determined by the grantor.
5. To cooperate with any governmental agency, or any person, firm or association in the conduct of any educational program, to accept grants or gifts from any source for the conduct of such program; and to conduct such program on or off campus.
6. To employ architects or engineers in planning the construction, remodeling or repair of any building or property and, whenever no other agency is designated by law so to do, to let contracts for such construction, remodeling or repair and to supervise the work thereof.
7. To have at all times, general supervision and control of all property, real and personal, appertaining to the university, and to insure the same.

Idaho Code § 33-3006.

MEMORANDUM DECISION AND ORDER – 12

In her current briefing, Dudley does little to help the Court. She backs off her prior arguments to some degree—citing just one of the above-referenced code sections (§ 33-3006) in a footnote (Dkt. 22, at 5 n.2)[13]—and summarily argues that the Idaho Supreme Court has held that "it is by now well-settled that the principal relationship between a college and its students is contractual" and that there is "no [] ambiguity" regarding whether she has a property interest in her education. Dkt. 22, at 5 (citing *Wickstrom v. North Idaho College*, 725 P.2d 155, 157 (Idaho, 1986) (cleaned up). Again, the Court disagrees.

In *Wickstrom*, the Idaho Supreme Court held that the relationship between a college and its students is contractual and that a student could file a cause of action sounding in contract law. This was based upon a university's representations that graduates of a particular discipline would be qualified for certain positions but upon graduation, the graduates discovered that was not the case. *See generally id* at 156.[14] Having a contractual agreement with another party is not the same as one party granting the other party a

---

[13] At oral argument, Dudley referred to paragraph 20 of her Amended Complaint which references the other code section (§ 33-4005). She argued that code section incorporated another subsection of chapter 33—§ 33-2811 and that this incorporated subsection gives colleges and universities the authority to grant academic degrees to students who are entitled to them. This language is very similar to the language in § 33-3006 outlining that universities have the power "to grant academic degrees to those students entitled thereto." Dudley argued this type of language creates a mutual understanding between the parties that, in turn, creates a property interest. As will be explained, however, this is not the case because regardless of whether there is a contractual arrangement between the parties, such does not automatically mean a property interest also exists. Regardless, the Court reiterates that these sections and subsections cover general governance of state institutions of higher education; they do not bestow property rights on students.

[14] Dudley also cites *George v. University of Idaho*, 822 P.2d 549 (Idaho App., 1991) for a similar proposition. In *George*, the Idaho Court of Appeals held that a university's faculty-staff handbook created an implied contract to which the University was bound when investigating allegations of sexual harassment. *Id*. at 557.

property interest in something. The point the *Wickstrom* Court was making was that principles of contract law govern allegations that an implied contract had been breached between a university and its students as it relates to the expectations of graduation.[15] Furthermore, *Wickstrom* may not remain good law considering guidance from the Idaho State Board of Education ("ISBOE").

The February 2022 version of the ISBOE's manual—which would have been in effect at the time of the events in question here—mandates that Universities (including BSU) *disclaim* contractual reliance on things such as catalogues, bulletins, and the like. ISBOE Governing Policies and Procedures § III(P)(3), available at: https://perma.cc/8HC7-SKF8. BSU's undergraduate catalog contains such a disclaimer. BSU Undergraduate and Graduate Catalog, available at https://perma.cc/ALV2-KGG5.

To be sure, these disclaimers appear to be geared towards situations in which a class is cancelled, fees are increased, or the academic calendar is changed and a university's desire to withstand student challenges to the same. But there are also provisions that the university reserves the right to "change the regulations and requirements governing instruction in, and graduation from, the university and its various divisions." *Id*. This disclaimer may very well override any judicial decree from *Wickstrom* that universities and students share a binding contractual relationship.

Nevertheless, this reference to *Wickstrom* is Dudley's *only* source for her claim that

---

[15] What's more, even assuming for the sake of argument that this "contractual" relationship between Dudley and BSU conveyed some type of property interest, Dudley broke the contract by disobeying BSU's rules when she viewed information she did not have authorization to view. As a result, BSU was not required to fulfill its end of the contract and provide her with a degree (her property interest).

she has a property interest in her education in Idaho. But she cites to no actual "state law" as required. *Roth*, 408 U.S. at 577.

The Court previously reviewed three cases it found from the Idaho Federal District Court on this topic. Dkt. 11, at 10. In sum, two cases related to high school students and one to college students.[16] As part of this discussion, the Court will briefly review these cases again. It will also highlight an additional case that was issued *after* the Court's prior decision.

In the first case, Judge Edward J. Lodge held—citing *Goss*—that high school students have a property right in their education. But he did not cite any state law for that proposition. *Howard v. Yakovac*, 2006 WL 1207615, at *7 (D. Idaho May 2, 2006). In the second case, Judge Candy W. Dale also held that, under *Goss,* high school students "have a property interest in their public education." *B.W. through Wann v. Vallivue Sch. Dist. No. 139*, 2018 WL 2448448, at *9 (D. Idaho May 31, 2018). Judge Dale likewise did not reference an independent source of state law for her conclusion.

The Court is loath to disagree with its colleagues, but respectfully must do so in this case. Yes, *Goss* clearly stated that students are entitled to a public education, but only "on the basis of state law." *Goss, 419* U.S. at 573. Neither Judge Lodge or Judge Dale cited to any state law or statute in support of their conclusion that these high school students had a property interest in their education in Idaho.[17]

---

[16] The Court is not implying this distinction is relevant but notes there appear to be far more regulations for K-12 students in Idaho as compared to university students. *See generally* Idaho Code Title 33.

[17] The discussion on property interest in *Howard* comprised a single paragraph and, ultimately, Judge Lodge found that the property interest claim was meritless from the outset. In *B.W. through Wann*, Judge Dale's

Finally, Judge B. Lynn Winmill—in the only case the Court could locate dealing with a collegiate-level student—dismissed the Plaintiff's claim that he had a property interest in his enrollment at Idaho State University because he "point[ed] to no state law creating a property interest in his education or scholarship" *Duffin v. Idaho State Univ.,* 2017 WL 6543873, at \*5 (D. Idaho Dec. 21, 2017). Notably, Judge Winmill observed that the Court was also "unaware of any such law" that would vest a college student with a property right. *Id*.

Since the Court's prior decision, one other case has issued from within the District of Idaho which bears mentioning.

In *Zeyen v. Boise Dist. #1*, a group of Plaintiffs challenged certain school fees the state of Idaho was charging alleging that action was a violation of the Takings Clause of the Fifth Amendment. 522 F. Supp. 3d 788 (D. Idaho 2021). In early motion practice, Judge Winmill held plaintiffs had "an independent source for their property right in the free education provision of the Idaho Constitution" for Takings Clause purposes. *Id*. at 796. The case was later reassigned to Judge Richard C. Tallman who eventually reversed that holding. *Zeyen v. Boise Dist. #1,* 2023 WL 4215402 (D. Idaho June 9, 2023). It must be emphasized that this particular case dealt primarily with the Takings Clause (and again was directed at the K-12 education scheme in Idaho). Thus, while Plaintiffs had alleged a Due Process claim on the same facts as their Takings Claim, Judge Tallman found "Plaintiffs'

---

discussion was slightly longer, but she too ultimately determined the school district defendant followed correct procedures—including written notice and an opportunity to appeal—and did not violate the student's due process rights.

Due Process Clause claims [were] legally and factually deficient," and summarily dismissed them. But, importantly, in discussing the Takings Claim, Judge Tallman reiterated the difference between general entitlements and vested property rights and held that "the Idaho Constitution does not directly purport to establish an individual right" to education in Idaho. *Id*. at *5.[18]

As noted, because this area of law is "difficult to parse," Dkt. 11, at 11 n.5, the Court previously assumed, without formally deciding, that Dudley had a property interest in her education. Today, however, it formally decides she does not. Dudley points to no state law or statute that vest in her a property interest in higher education. And, like Judge Winmill in *Duffin*, the Court has scoured Idaho's laws and statutes and cannot locate any authority that would allow her to proceed under such a theory.

This holding effectively ends this case. Because there is no property interest at stake, there can be no due process violation. The Court could dismiss the case without further discussion. Such circumstances, however, put the Court in an awkward position. Continuing its analysis may seem to undercut its above holding. On the other hand, were the Court to end its analysis here and later be reversed as to its conclusion regarding a property interest, it would have to re-visit the case; thus incurring additional time and expense. There is no reason to go that route, however, because *even assuming arguendo* that Dudley had a property interest in her degree, her claims would still fail because BSU afforded her ample process *and* Defendants are entitled (for the most part) to qualified

---

[18] This case is currently on appeal and set for oral argument before the Ninth Circuit on May 9, 2024.

immunity. The Court will review the processes shortly. But before doing so, it must briefly address Dudley's companion argument that, in addition to a *property* interest in her degree, she also had a *liberty* interest that has been violated.

### B. Liberty Interest

A liberty interest may be implicated "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him . . . ." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). However, "procedural due process protections apply to reputational harm only when a plaintiff suffers stigma from governmental action plus alteration or extinguishment of 'a right or status previously recognized by state law.'" *Humphries v. County of Los Angeles*, 554 F.3d 1170, 1185 (9th Cir. 2008) *as amended* (Jan. 30, 2009), *rev'd and remanded sub nom. Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29 (2010) (*quoting Paul v. Davis*, 424 U.S. 693, 711 (1976)). This is called the stigma-plus test.

Dudley clarified in her response brief that she does not intend to pursue a stigma-plus claim against the BSU Defendants; only against defendant Dixon. She does, however, wish to pursue an "occupational liberty" claim against the BSU defendants. Dkt. 22, at 9.[19] The Court will briefly address each.

---

[19] Defendants argue Dudley is writing in a distinction where there is none because occupational liberty claims are the same as stigma-plus claims. The Court tends to agree. *See, e.g., Segal v. City of New York*, 368 F. Supp. 2d 360, 362 (S.D.N.Y. 2005), aff'd 459 F.3d 207 (2d Cir. 2006) ("Loss of reputation can constitute deprivation of a liberty interest when, for example, it occurs in the course of dismissal from government employment. This is commonly referred to as a 'stigma-plus' claim."). Regardless, the Court will briefly analyze each contention.

### 1. Occupational Liberty against BSU

"[A] plaintiff can make out a substantive due process claim if she is unable to pursue an occupation and this inability is caused by government actions that were arbitrary and lacking a rational basis." *Engquist v. Oregon Dep't of Agric.*, 478 F.3d 985, 997 (9th Cir. 2007), aff'd sub nom. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591 (2008). Courts, however, have limited these types of claims to "extreme cases" such as "a government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of an individual in an occupation that requires licensure." *Engquist*, 478 F.3d at 997–98 (cleaned up). Furthermore, cases involving a violation of this interest "have dealt with a complete prohibition on the right to engage in a calling, and not a sort of brief interruption." *Paul v. City of Sunnyside*, 405 F. App'x 203, 205 (9th Cir. 2010) (cleaned up). And notably, "the [Supreme] Court has never held that the right to pursue work is a fundamental right." *Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004), as amended (Oct. 18, 2004).

In this case, Dudley has not alleged she has been foreclosed entirely from her chosen profession. Presumably she could obtain the credits necessary for a social work degree from another institution and still obtain licensing in the state of Idaho. Because of this, her liberty interest claim against BSU is without merit.

### 2. Stigma-plus against Dixon

Dudley next alleges that Defendant Mike Dixon violated her procedural due process rights by publishing false and stigmatizing information to Defendants Roark and Law

which resulted in her grade change, degree revocation, and expulsion. As a reminder, Dixon works for the IDHW and was the person who brought his concerns to Roark regarding Dudley's improper records searches during her internship.

To establish a "stigma-plus," cause of action a "plaintiff must show [1] the public disclosure of a stigmatizing statement by the government, [2] the accuracy of which is contested, [3] plus the denial of some more tangible interest such as employment, or the alteration of a right or status recognized by state law." *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002) (cleaned up).

Dudley's claim fails at the outset because there was no public disclosure here. Dixon (an individual) relayed his comments to Roark (another individual). Dudley takes issue with the fact that Dixon also communicated with a third-party—Audrey—about this investigation. The Court believes Audrey to be Dudley's ex-husband's new partner. It is the Courts understanding that Audrey was the individual who brought these issues to Dixon's attention in the first instance after Dudley sent her ex-husband and/or Audrey disparaging text messages that included certain facts she could have only known had she viewed private, confidential files. That Dixon communicated with Audrey (and subsequently that BSU communicated with Audrey as a witness) is not a public disclosure of stigmatizing information about Dudley. There is no liberty interest claim here either.

The Court returns to its discussion regarding the processes BSU afforded Dudley and whether those processes were adequate *assuming* she had a protected property interest and was entitled to some modicum of due process in the first place.

### C. Adequate Process

It is undisputed that BSU, a state instrumentality, took steps that ultimately lead to the revocation of Dudley's grade, degree, diploma, and opportunity to enroll in future classes. Thus, were the Court to assume a property interest, the next question would be whether BSU afforded Dudley the process due her under the Constitution.

As the Court previously noted—*see* Dkt. 11, at 7–8—there are really two sequences of events at issue that Dudley challenges. The first is the revocation of her SOCWRK 481 grade which lead to the revocation of her bachelor's degree. The second is the Student Conduct Hearing which lead to Dudley's expulsion from BSU (and the inability to re-enroll). The Court will analyze the two categories of disciplinary action separately.

### 1. Grade / Degree

The "fundamental requirement of due process is the opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, (1965) (cleaned up). When depriving a student of a property or liberty interest for academic reasons, however, a university need not hold a hearing. *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 85, 89-91 (1978). A university meets the requirements of procedural due process in that circumstance so long as the academic decision is "careful and deliberate." *Id*. at 85. That said, if the decision is disciplinary, more formal proceedings (such as a hearing) are *usually* required. *Id*. at 88–89.

Herein lies a primary disagreement between the parties. Citing *Horowitz*, BSU contends that, regardless of what happened at the IDHW, the net result was Dudley did not complete the academic requirements of SOCWKR 481 and, accordingly, she failed the

course. In like manner, because the revocation of Dudley's degree was related to her failing grade—that is, her academic performance—BSU argues both decisions were academic in nature. 435 U.S. at 86. Dudley also cites to *Horowitz*, but argues instead that, because the decision to change her grade was not based on academic performance, but rather alleged misconduct, it was disciplinary—and thus required more formal due process measures such as notice and a hearing.

Both parties oversell their respective position and reliance on *Horowitz*.

BSU's conclusion that the decision here was academic is not a slam dunk. To be sure, Dudley's *academic* diploma had to be rescinded because her *academic* grade was changed in light of her failure to complete the *academic* requirements of SOCWRK 481. But it is difficult to say the reason for the change itself was academic. The cases BSU cites discuss situations where a *current* student's performance, lack of dedication, failure to complete clinical hours, or attendance warranted the failing grade.[20] Here, Dudley had already completed the academic requirements of her internship. She had fulfilled the hours. She had received a passing grade. Her grade was changed (and her degree revoked) because of her misconduct during her internship. That result feels more disciplinary than academic.

But Dudley has over-emphasized her position as well. In *Horowitz,* the Supreme

---

[20] BSU also cites to some cases that imply a closer relationship between discipline and academics. *See, e.g., Taylor v. Bd. of Regents of Univ. Sys. of Georgia*, 2022 WL 4857906, at *6 (N.D. Ga. Oct. 3, 2022) ("The questions of how Plaintiff's disciplinary penalty should be computed into his course grade and how it reflected on his general academic progress are, the Court finds, essentially academic ones."); *Oyama v. Univ. of Hawaii*, 813 F.3d 850, 875 (9th Cir. 2015) ("That the University's decision was based on Oyama's professional disposition, and not his intellectual aptitude, does not strip it of its academic character. In the context of this certification program, a central criterion for academic success was a demonstration of the ability to satisfy professional standards for teacher certification."). Each of those decisions turned on case-specific facts—none worth delving into—that render each helpful, but not binding, on the Court today.

Court did explain a difference between academic and disciplinary proceedings. But in reviewing relevant caselaw on the topic, it held only that, "a public hearing *may* be regarded as helpful to the ascertainment of misconduct . . . ," *id*. at 87 (cleaned up; emphasis added) and that "even in the context of a school disciplinary proceeding, [it had previously] stopped short of requiring a *formal* hearing . . . ," *id*. at 89 (emphasis in original). *See, e.g., Goss*, 419 U.S. at 580–83 (explaining that if a student is dismissed for disciplinary purposes, he or she is typically entitled to notice, a hearing, an explanation of the evidence, and an opportunity to respond to the allegations). Importantly, most of the scenarios Dudley cites to were in the context of suspension or expulsion—which the Court will discuss next—as opposed to a grade change or degree revocation.

But even assuming the grade change and degree revocation actions in this case were disciplinary, the Court cannot agree with Dudley. While there was no formal hearing for the grade change, Roark informed Dudley of the reasons why her grade was being changed from "pass" to "fail," and Dudley had an opportunity to appeal that decision to three different individuals at BSU.[21]

Candidly, this distinction between academic decisions and disciplinary decisions can be a close call—as is the case here. However, under the circumstances, the Court finds that regardless of whether Roark's decision was academic or disciplinary, the due process BSU afforded Dudley as to her grade change and the recission of her diploma was adequate.

---

[21] Dudley's challenge to her degree revocation is even more removed from a due process challenge. That individual—Nelson—simply processed the notification sent to her by Roark that Dudley's grade had been changed and she no longer met the graduation requirements. Nelson did little more than "clerical work." She had no reason, or responsibility, to engage Dudley in any kind of process before revoking her degree.

*2. Student Conduct Hearing*

Unlike the above issue, the analysis here is much more straightforward. It is undisputed that Dudley received notice of the Student Conduct Hearing (both times). In addition to notice, she was able to have sit-down meetings with individuals and was provided packets of information about what would occur at the hearing and what her rights and responsibilities were. And at the hearing itself, Dudley heard the evidence against her and was given an opportunity to counter that evidence.

Granted, Dudley takes issue with certain aspects of the hearing—how much time she was allotted, witness statements being used as opposed to live witnesses, the veracity of certain evidence levied against her, etc.—but disagreements with the process itself are largely immaterial. *See Summers v. City of McCall*, 84 F. Supp. 3d 1126, 1148 (D. Idaho 2015) (noting that, although the plaintiff disagreed with the process and outcome, such did not demonstrate that defendant "failed to satisfy the essential due process demands of notice and an opportunity to be heard"). BSU provided notice, an informational meeting and packet, and a hearing. That Dudley did not like the exact procedures employed, however, is not dispositive of anything. BSU is not required to comply with the demands of every student and how he or she believes the hearings should be conducted.[22]

Besides notice and an opportunity to be heard, Dudley was also allowed to appeal

---

[22] Of course, the Court is not implying BSU is free to ignore general principles of equity and fairness in its hearing process. But, again, the Student Conduct Hearing is not a court proceeding bound by rules of evidence or other statutory maxims. So long as BSU provides notice of the disciplinary action (which it did in this case) and an opportunity to be heard (again, satisfied here) and its process is "careful and deliberate" (which, by all accounts it was in this instance), the Fourteenth Amendment's Due Process considerations have been satisfied. *Horowitz*, 435 U.S., at 85.

the decision of the Student Conduct Board. Her appeal was denied; however, it appears she could have appealed that denial to the Idaho State Board of Education but elected not to do so.[23]

In sum, because "the College provided reasonable oral or written notice of the charges raised at the [] hearing, and offered a reasonable opportunity for [Dudley] to be heard, [] the requirements of the due process clause of the Fourteenth Amendment are satisfied." *August v. Los Angeles Cmty. Coll. Dist. Bd. of Trustees,* 848 F.2d 1242, *3 (9th Cir. 1988) (cleaned up).

### D. Qualified Immunity

Finally, *even if* Dudley had a property interest in her degree and *even if* the Defendants had not provided her with adequate due process under the Fourteenth Amendment, she still would not prevail because the Defendants are entitled to qualified immunity—at least in part.

In her Amended Complaint—titled "First Amended Complaint for *Injunctive Relief* and Demand for Jury Trial" (emphasis added)—Dudley couches her causes of action as requiring "relief" in largely non-economic terms. She requests that BSU restore her passing grade, restore her degree, and reverse its expulsion decision. And, of course, her Fourth Claim is solely for injunctive relief. Dkt. 15, at 49. But she also requests monetary damages (general, compensatory, consequential, presumed, pecuniary, and non-pecuniary). *Id.* at

---

[23] Dudley claims she did not know this was an option. Dkt. 22, at 13 n.7. Regardless of whether she knew, the point is Dudley had numerous opportunities for varying people to review her situation. Her contention in briefing and at oral argument that this was, in essence, an orchestrated conspiracy to "ratify" Roark's illegal decision falls flat considering multiple people in various positions at various levels (including volunteers) reviewed what took place.

41, 48, 51.

The Court highlights the distinction between the types of relief sought because qualified immunity is an affirmative defense to *damage liability*; it does not bar actions for declaratory or injunctive relief. *Harlow v. Fitzgerald,* 457 U.S. 800, 808 (1982). Thus, Defendants use of this defense is not as broad as they assert in the briefing. *See* Dkt. 19-1, at 19; Dkt. 25, at 4–5 (seeming to imply qualified immunity is a defense to *all* of Dudley's claims in *all* forms). Thus, as applied to the sub-set of any claim requesting monetary damages, the Court finds qualified immunity is a defense to Dudley's claims; however, as applied to the sub-set of any claim requesting injunctive or declaratory relief, qualified immunity is not a defense.

"A state official is entitled to qualified immunity unless a plaintiff pleads facts showing '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Pavel v. Univ. of Oregon*, 774 F. App'x 1022, 1024 (9th Cir. 2019) (cert. denied) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The plaintiff has the burden of establishing that the law was well-established. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir.2002). Clearly established law "should not be defined at a high level of generality" but "must be particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up).

Although "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id*. (cleaned up). This gives

government officials "breathing room to make reasonable but mistaken judgments about open legal questions."

In this case, Dudley has not established that her rights, in particular her alleged liberty or property interests, were clearly established at the time Defendants acted because there are no state statutes conveying any such rights. As the Ninth Circuit recently noted in affirming this Court's decision that certain state officials would not have known whether a policy was unconstitutional, "the district court had to apply a complicated procedural due process balancing test to decide this case. It would be unreasonable to expect Appellees to correctly apply this test and determine that they should not comply . . . ." *Filler v. Unsworth*, 2024 WL 747011, at *1 (9th Cir. Feb. 23, 2024). So too here. If the Court had a difficult time culling through the legal landscape to determine whether Dudley had a property interest at stake in the first place, it would appear to be self-evident that the right was not clearly established. As such, Defendants are entitled to qualified immunity for their actions and cannot be held liable for damages.

And while Defendants may not be entitled to qualified immunity on Dudley's injunctive claims, as was explained above—and as will be summarized next—because Dudley cannot state any plausible causes of action, there is no injunctive relief to be given.

### E.  Injunctive Relief

Dudley's fourth and final cause of action is for injunctive relief. Dkt. 15, at 49–50. As described at length above, Dudley has failed to allege facts sufficient to state a plausible procedural due process claim against Defendants that entitles her to any relief. Accordingly, this final claim must be dismissed because there is no relief to grant.

## V. CONCLUSION

The Court is not oblivious to the ramifications of its decision today. Dudley will lose her degree. A degree she spent a significant amount of time and (presumably) a significant amount of money to obtain. But the law is clear.

Dudley cites no independent Idaho statute or law that bestows on her a property interest in her education at BSU. This dooms her claim from the outset because there can be no due process violation in the absence of a protected property interest. Even if she had stated a valid interest, however, she would still not prevail because BSU afforded her significant due process as part of each disciplinary action it took. And even if BSU's process was flawed, it is entitled to qualified immunity on many of Dudley's claims. In sum, all of Dudley's causes of action must be dismissed.

The only remaining question then is whether the Court should allow Dudley an opportunity to amend her Amended Complaint. Defendants urge the Court not to allow amendment, but to dismiss with prejudice. The Court agrees that dismissal with prejudice is appropriate at this stage.

The Court typically follows the standard set forth by the Ninth Circuit that dismissal should be without prejudice unless it is beyond doubt the complaint could not be saved by an amendment. *See Harris,* 573 F.3d at 737. In this case, however, it is clear that amendment could not save the complaint because this is not a situation where more (or different) facts might change the outcome. The Court's ruling today is a legal conclusion. Nothing will change the fact that Idaho does not recognize a property interest in a college degree. S*ee Mountainwest Ventures, LLC v. City of Hope,* 2015 WL 222448 at *4 (D. Idaho

2015) (noting that, because there was no way Plaintiff "could amend its complaint to allege a protectable property interest" the Court was within its rights to "dismiss th[e] claim without leave to amend"). Because nothing can save Dudley's claims, the Court will dismiss her Amended Complaint with prejudice and without leave to amend.

## VI. ORDER

Now, therefore, **IT IS HEREBY ORDERED**:

1. Defendant's Motion to Dismiss (Dkt. 19) is GRANTED.

2. This case is DISMISSED WITH PREJUDICE and CLOSED.

3. The Court will enter a separate judgment in accordance with Federal Rule of Civil Procedure 58.

DATED: May 3, 2024

David C. Nye
Chief U.S. District Court Judge